# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued February 6, 2019       Decided March 15, 2019

No. 18-1166

MISSOURI RIVER ENERGY SERVICES,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

BASIN ELECTRIC POWER COOPERATIVE, ET AL.,
INTERVENORS

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

*Lawrence G. Acker* argued the cause for petitioner. With him on the briefs were *Philip W. Mone* and *Gabriel L. Tabak*.

*Jared B. Fish*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were *James P. Danly*, General Counsel, and *Robert H. Solomon*, Solicitor. *Carol J. Banta*, Attorney, entered an appearance.

*William D. Booth* argued the cause for intervenors. With him on the joint brief was *David D'Alessandro*. *Jonathan P. Trotta* and *Marie Denyse Zosa* entered appearances.

Before: GARLAND, *Chief Judge*, SRINIVASAN, *Circuit Judge*, and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* SRINIVASAN.

SRINIVASAN, *Circuit Judge*: In 2015, Missouri River Energy Services, a collection of municipal entities, became a member of the Southwest Power Pool. Missouri River claimed it should be exempt from certain charges assessed by the Pool, and the parties submitted the dispute to the Federal Energy Regulatory Commission. FERC sustained the charges, and Missouri River now petitions for review of FERC's decision. We conclude that FERC's determination was not arbitrary and capricious and thus deny Missouri River's petition for review.

I.

Missouri River Energy Services is an organization of 61 municipal utilities in the Upper Midwest. Missouri River helps its member municipal electric systems source power. To that end, in the 1970s, Missouri River teamed up with other energy-related entities to construct the Laramie River Station (a power plant) and various transmission facilities.

In 1977, those entities entered into a contract with Nebraska Public Power District, under which Missouri River and its partners agreed to help defray Nebraska Power's construction and operation costs for new transmission facilities. In exchange, Nebraska Power agreed to allow the entities to use the new facilities to transmit some of the power from the Laramie River Station. For the last four decades,

Missouri River has used that arrangement under the 1977 Contract to help move electricity generated by the Laramie River Station part of the way from the power plant to Missouri River's member utilities.

In 2008, Nebraska Power asked to join the Southwest Power Pool, a Regional Transmission Organization that "provides transmission service to approximately 6 million households across portions of eight states." *Okla. Gas & Elec. Co. v. FERC*, 827 F.3d 75, 77 (D.C. Cir. 2016). (A Regional Transmission Organization oversees electricity grids on a regional scale and coordinates transmission service to ensure reliable and efficient transmission. *See Morgan Stanley Capital Grp. v. Pub. Utility Dist. No. 1*, 554 U.S. 527, 535–37 (2008).) As part of the process of accepting Nebraska Power into the Southwest Power Pool, the Pool filed proposed revisions of its bylaws and Tariff. Those revisions included adding the 1977 Contract to the Pool's list of Grandfathered Agreements, which meant that service under the 1977 Contract would be exempt from certain provisions of the Tariff. In late 2008, FERC approved the proposed revisions, Nebraska Power became a member of the Pool, and Missouri River's transmission service under the 1977 Contract continued unchanged.

Four years later, the Pool decided to implement a new Integrated Marketplace that included energy markets in which Pool members could bid for energy services. As part of that implementation, the Pool proposed imposing additional charges on its members to account for energy loss due to transmission and transmission congestion. A number of parties, including Missouri River, protested the imposition of those charges on transmission covered by Grandfathered Agreements (including the 1977 Contract).

The Pool stated that it would not impose additional charges on Missouri River's reservation under the 1977 Contract because Missouri River was outside the footprint of the Pool. Missouri River then withdrew its protest. The Pool proceeded to settlement negotiations with the other protesting parties, and those negotiations produced a Carve-Out Settlement that identified specific Grandfathered Agreements that were eligible for exemption (i.e., eligible to be carved out) from the congestion and marginal loss charges. In particular, § 2.2 of the Carve-Out Settlement stated that Schedule 1 of the Carve-Out Settlement "constitutes the exclusive list of eligible 'Carved-Out GFAs,' meaning that only those agreements and the megawatts associated with them identified on Schedule 1 are eligible for carve-out treatment." J.A. 377. And Schedule 1 clarifies that, with respect to the 1977 Contract, Missouri River's reservation is not "eligible for carve-out." J.A. 385. The Pool filed that Carve-Out Settlement with FERC, and FERC approved it.

In 2014, after the Carve-Out Settlement had been filed and approved, a number of Missouri River's business partners (but not Missouri River) filed a request to join the Southwest Power Pool. The Pool, in turn, filed proposed Tariff revisions with FERC to allow those parties to join. Missouri River protested the Pool's proposal, which did not carve out Missouri River from congestion and marginal loss charges for transmission under the 1977 Contract. In response, FERC generally approved the Pool's proposed revisions but set aside the carve-out issue for settlement procedures. In late 2015, those parties became members of the Pool, as did Missouri River.

Although Missouri River and the Pool engaged in extensive settlement negotiations, they were unable to reach an agreement on the carve-out issue. Instead, they agreed to a set of stipulated facts and requested a shortened hearing process

before FERC on the issue of whether Missouri River is entitled to carve-out treatment for its transmission reservation under the 1977 Contract. Following that hearing process, FERC sided with the Pool.

First, FERC determined that the terms of the Southwest Power Pool Tariff did not entitle Missouri River to carve-out treatment. FERC reasoned that the Tariff is ambiguous about which agreements are eligible for carve-out treatment and then looked to extrinsic evidence to resolve that ambiguity in the Pool's favor with regard to Missouri River's reservation under the 1977 Contract. Second, FERC determined that the exclusion of Missouri River from carve-out eligibility was permissible, rejecting Missouri River's arguments that the exclusion constituted undue discrimination, that the exclusion impermissibly modified or abrogated the 1977 Contract, and that the Pool should be equitably estopped from denying Missouri River carve-out treatment.

After FERC denied Missouri River's motion for rehearing, Missouri River filed the present petition for review.

## II.

We review FERC's orders under "the arbitrary and capricious standard of the Administrative Procedure Act." *Alcoa Inc. v. FERC*, 564 F.3d 1342, 1347 (D.C. Cir. 2009); *see* 5 U.S.C. § 706(2). That means "[w]e affirm the Commission's orders so long as FERC examined the relevant data and articulated a rational connection between the facts found and the choice made." *Alcoa*, 564 F.3d at 1347 (internal quotation marks and alterations omitted).

Missouri River challenges FERC's determination that it is ineligible for carve-out treatment on five grounds. We find none of Missouri River's arguments persuasive.

*First*, Missouri River argues that Southwest Power Pool's Tariff unambiguously establishes that Missouri River's transmission reservation under the 1977 Contract is eligible for carve-out treatment. The relevant language of the Tariff, in § 2.16 (entitled "Grandfathered Agreement [GFA] Carve Out"), provides that Pool members "that are a party to GFA(s) eligible for GFA Carve Out" may elect from among various options, including carve-out treatment. J.A. 415. According to Missouri River, because the Tariff's list of Grandfathered Agreements includes the 1977 Contract, the carve-out provision unambiguously provides Missouri River a right to elect carve-out treatment. That is incorrect.

Of course, the 1977 Contract is a GFA. But § 2.16 of the Tariff provides that only GFAs "eligible for GFA Carve Out" may receive carve-out treatment, which implies that some GFAs are eligible for such treatment and others are not. And neither § 2.16 nor any other provision of the Tariff explains what makes a GFA carve-out eligible. For that reason, FERC understandably found the Tariff ambiguous with respect to the eligibility of Missouri River's transmission reservation for carve-out treatment. We thus reject Missouri River's argument that the Tariff unambiguously confers carve-out eligibility on its transmission reservation under the 1977 Contract.

*Second*, Missouri River argues that, even if the Tariff is ambiguous, FERC erred by relying on extrinsic evidence—in the form of § 2.2 and Schedule 1 of the Carve-Out Settlement—to resolve the ambiguity. In Missouri River's view, FERC instead should have resolved the ambiguity by reference to the doctrine of *contra proferentem*, under which ambiguities are

resolved against the drafter. Missouri River contends that FERC has previously adhered to a policy favoring use of *contra proferentem* to resolve ambiguities and it therefore must explain its decision to depart from that policy and to rely instead on extrinsic evidence.

Missouri River's argument fails at the threshold: FERC has not adhered to a policy of resolving ambiguities with the *contra proferentem* canon rather than with extrinsic evidence. Although Missouri River identifies a number of cases in which FERC has relied on the *contra proferentem* canon, *see* Missouri River Br. 34–35 (collecting cases), in none of those cases did the agency turn to *contra proferentem* in the face of available extrinsic evidence.

By contrast, FERC has repeatedly relied on extrinsic evidence to resolve ambiguities even in the face of arguments from a party to use the *contra proferentem* canon. *See, e.g.*, *Cent. N.Y. Oil & Gas Co.*, 152 FERC ¶ 61,097, at pp. 20–37 (2015) (using extrinsic evidence to help resolve an ambiguity in a service agreement even though one party urged FERC to apply the *contra proferentem* canon); *Miss. River Transmission Corp.*, 96 FERC ¶ 61,185, at p. 61,189 (2001) (rejecting a party's assertion that a tariff ambiguity should, as a matter of law, be resolved against the drafter and instead scheduling an evidentiary hearing to allow the parties to introduce extrinsic evidence of intent); *cf. KN Energy, Inc.*, 59 FERC ¶ 61,332, at p. 62,219 (1992) (applying *contra proferentem* but only because the objecting party had "offer[ed] no evidence, nor describe[d] any surrounding circumstances, that would indicate" the intent behind the relevant ambiguous provision). Because FERC has had no policy of favoring *contra proferentem* over extrinsic evidence as a means of resolving ambiguities, we reject Missouri River's argument that FERC

improperly changed course by relying on extrinsic evidence in this case.

We note, moreover, the strength of the extrinsic evidence on which FERC relied. Section 2.2 of the Carve-Out Settlement, filed on the same day as the Tariff revision at issue, states that Schedule 1 of the Carve-Out Settlement "constitutes the *exclusive* list of eligible 'Carved-Out GFAs,' meaning that only those agreements and the megawatts associated with them identified on Schedule 1 are eligible for carve-out treatment." J.A. 377 (emphasis added). FERC reasonably concluded that the concurrently filed Carve-Out Settlement, which identified "eligible 'Carved-Out GFAs,'" gives meaning to which GFAs are "eligible for GFA Carve Out" under § 2.16 of the Tariff. J.A. 415. And because Missouri River's reservation under the 1977 Contract is not identified on that "exclusive list," it is, under the Carve-Out Settlement, not "eligible for carve-out." J.A. 385.

*Third*, Missouri River argues that excluding its transmission reservation from carve-out eligibility amounts to undue discrimination in violation of the Federal Power Act. Under the Act, no public utility may "make or grant any undue preference or advantage to any person or subject any person to undue prejudice or disadvantage" nor may a public utility "maintain any unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service." 16 U.S.C. § 824d(b). A mere difference in the treatment of two entities does not violate that provision; instead, undue discrimination occurs only if the entities are "similarly situated," *State Corp. Comm'n v. FERC*, 876 F.3d 332, 335 (D.C. Cir. 2017) (internal quotation marks omitted), such that "there is no reason for the difference," *Transmission Access Policy Study Grp. v. FERC*, 225 F.3d 667, 721 (D.C. Cir. 2000) (per curiam). FERC has

"wide discretion . . . to determine what constitute[s]" undue discrimination. *Id.*

Here, Missouri River's claim of undue discrimination rests on the Pool's grant of carve-out treatment to a transmission reservation owned by Lincoln Electric System pursuant to the same 1977 Contract. FERC acknowledged that excluding Missouri River's transmission reservation from carve-out resulted in a disparity in treatment between Missouri River and Lincoln Electric. FERC, though, concluded that there was no undue discrimination because Missouri River and Lincoln Electric are not similarly situated with respect to the Pool's congestion and marginal loss charges. Specifically, FERC explained that Lincoln Electric was a member of the Pool when the Pool changed its Tariff to impose those charges (and was therefore "subject to a forced transition" to a Tariff with the charges), whereas Missouri River joined the Pool after the Tariff was changed to incorporate those charges. *Sw. Power Pool, Inc.*, 160 FERC ¶ 61,115, at pp. 61–63 (2017), J.A. 645–46. In light of that difference, FERC determined, it was permissible to treat the two entities differently. *Id.*

The distinction between pre-existing and new members is well-supported in FERC precedent. In one case, the Midwest Independent System Operator (MISO) sought to revise its Tariff to eliminate the possibility of carve-out treatment for certain Grandfathered Agreements held by prospective members and also to remove five of Dairyland's Grandfathered Agreements from eligibility for carve-out treatment. *See Dairyland Power Coop. v. MISO*, 131 FERC ¶ 61,163, at pp. 7–9 (2010). FERC approved in part and rejected in part those changes.

On the one hand, FERC allowed MISO to eliminate the availability of carve-out treatment for some agreements held by

prospective members because a "prospective transmission owner," unlike an existing member, "can analyze the costs of converting its GFAs to tariff service prior to integration, and weigh those costs against the benefits of [MISO] membership." *Dairyland Power Coop. v. MISO*, 129 FERC ¶ 61,221, at pp. 39–41 (2009). On the other hand, FERC rejected MISO's proposal to remove Dairyland's GFAs from the list of carve-out eligible agreements. *Id.* at pp. 42–44. FERC thereby drew exactly the distinction that it drew here, allowing different treatment of (i) prospective members seeking new carve-out treatment and (ii) members seeking to preserve pre-existing carve-out eligibility. In light of that precedent, Missouri River has not met its burden of showing that FERC acted arbitrarily and capriciously in determining that Missouri River and Lincoln Electric are not similarly situated. We therefore reject Missouri River's undue discrimination claim.

*Fourth*, Missouri River argues that imposing congestion and marginal loss charges on its transmission reservation improperly modifies the 1977 Contract. In rejecting that argument, FERC determined that "the assessment of congestion and marginal loss charges associated with GFA treatment do not represent a modification of the 1977 Contract because these charges are associated with new services available to [Missouri River] as a result of joining SPP, including access to the Integrated Marketplace and the ability to hedge congestion costs." *Sw. Power Pool*, 160 FERC ¶ 61,115, at p. 81, J.A. 653–54. Because FERC's "analysis hinges on interpretation of utility contracts, our review of that analysis is deferential." *Wis. Pub. Power, Inc. v. FERC*, 493 F.3d 239, 271 (D.C. Cir. 2007) (per curiam). Missouri River provides us with no reason to reject FERC's conclusion.

Missouri River notes that FERC once previously found, and we agreed, that excluding a Grandfathered Agreement

from carve-out eligibility constituted a modification of that agreement. *See* Missouri River Br. 19–20 (citing *MISO*, 121 FERC ¶ 61,166 (2007); and *Wis. Pub. Power*, 493 F.3d 239). In that case, however, FERC determined that subjecting the parties to the new Tariff "would impose significant changes in the manner in which transmission service is provided for" because there was a "direct collision between GFA scheduling practices and the MISO Tariff's scheduling requirements." *Wis. Pub. Power*, 493 F.3d at 272–73 (internal quotation marks omitted). Here, by contrast, FERC found no such "direct collision" between the 1977 Contract and the Pool's Tariff because the marginal loss and congestion charges related to additional services provided by Southwest Power Pool, such as "access to the Integrated Marketplace and the ability to hedge congestion costs," which were not provided for by (and the costs of which thus were not covered by the rates set in) the 1977 Contract. *Sw. Power Pool*, 160 FERC ¶ 61,115, at p. 81, J.A. 653–54; *cf. E. Ky. Power Coop., Inc. v. FERC*, 489 F.3d 1299, 1306–08 (D.C. Cir. 2007) (affirming FERC's determination that MISO may impose certain costs to account for various services and benefits that were not provided under the Grandfathered Agreements but that are provided by MISO). We see no reason to reject FERC's conclusion that the congestion and marginal loss charges at issue here pay for new services not provided for in the 1977 Contract.

*Fifth*, Missouri River argues that Southwest Power Pool should be equitably estopped from denying it carve-out treatment. Missouri River relies on the Pool's representation in 2013 that, "because [Missouri River's] reservation is not associated with an SPP Settlement Location or SPP transmission service, and is not tagged by SPP, it will not be subject to the rules and tariff requirements of SPP's proposed Integrated Marketplace" and "will not be assessed congestion costs or marginal losses." J.A. 819. Missouri River's

equitable-estoppel argument is forfeited because Missouri River has failed to fully develop it. *See SEC v. Banner Fund Int'l*, 211 F.3d 602, 613–14 (D.C. Cir. 2000). The argument is unpersuasive in any event.

The "traditional elements of" equitable estoppel include "false representation, a purpose to invite action by the party to whom the representation was made, ignorance of the true facts by that party, and reliance, as well as a showing of an injustice and lack of undue damage to the public interest." *ATC Petrol., Inc. v. Sanders*, 860 F.2d 1104, 1111 (D.C. Cir. 1988) (internal quotation marks and alterations omitted). Here, FERC concluded that if Missouri River relied on Southwest Power Pool's 2013 statement "to mean that [its] reservation under the 1977 Contract would be eligible for carve out treatment after [it] joined SPP, such reliance was unreasonable." *Sw. Power Pool*, 160 FERC ¶ 61,115, at p. 75, J.A. 651. That is because the language used by the Pool—that Missouri River would not be subject to the charges "because" it was not within the Pool's footprint—cannot reasonably be interpreted to mean that, if Missouri River were to come within SPP's footprint in the future, then the Pool would not impose charges at that time. And that is exactly what happened. The Pool did not seek to impose congestion and marginal loss charges on the 1977 reservation until Missouri River subsequently came within the Pool's footprint. We thus reject Missouri River's argument, to the extent it is not forfeited, that the Pool should be equitably estopped from imposing congestion and marginal loss charges against Missouri River.

\* \* \* \* \*

For the foregoing reasons, we deny the petition for review.

*It is so ordered.*