# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued November 10, 2021        Decided July 19, 2022

No. 20-1295

XCEL ENERGY SERVICES INC.,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

———

Consolidated with 20-1426

———

On Petitions for Review of Orders
of the Federal Energy Regulatory Commission

———

*Bryan Killian* argued the cause for petitioner. With him on the briefs were *Stephen M. Spina* and *Joseph Lowell*.

*Lopa Parikh*, *Jeremy C. Marwell*, *Margaret E. Peloso*, and *Matthew X. Etchemendy* were on the brief for *amicus curiae* Edison Electric Institute in support of petitioner.

*Jared Fish*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief were *Matthew R. Christiansen*, General Counsel, and

*Robert H. Solomon*, Solicitor. *Susanna Y. Chu*, Attorney, entered an appearance.

Before: HENDERSON, MILLETT, and WALKER, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* MILLETT.

MILLETT, *Circuit Judge*: Electricity grids are natural monopolies. To prevent utilities such as grid operators from abusing their market power, Congress has given the Federal Energy Regulatory Commission the responsibility to ensure that rates and rules under its jurisdiction are "just and reasonable[.]" 16 U.S.C. § 824d(a). The issue in this case is whether the Commission reasonably used that authority to reject a rule the agency found would risk favoring a vertically integrated operator's own power plants over those of its rivals.

The Public Service Corporation of Colorado is a grid owner and subsidiary of petitioner Xcel Energy Services, Inc. (collectively, "PS Colorado"). The utility is vertically integrated in that it both operates an electricity transmission network and owns power plants that generate about 60% of the power on its grid.

In 2020, PS Colorado filed an application with the Commission to change how it processes power plant requests to interconnect—that is, to plug in—to its grid. Under Commission rules, grid operators generally must consider requests to connect on a first-come, first-served basis. PS Colorado proposed a fast-track process for generators looking to replace an existing power plant with a new one on the same site. (By generators, we mean both power plants and owners and developers of powers plants.) The company reasoned that this fast-track process would avoid wasteful grid-impact

studies and would allow new power plants to join the network more quickly. PS Colorado noted that the agency had granted virtually identical requests filed by other grid operators.

The Commission denied PS Colorado's request. It held that the proposal risked unduly preferring the company's own power plants over would-be entrants to its grid. While the Commission had granted similar interconnection proposals in the past, all of those had been filed by independent grid operators, which are operators that do not also own generators on their networks. The agency was less concerned in those cases that the operator would have a reason to prefer some generators over others.

We hold that the Commission reasonably explained its rejection of PS Colorado's proposal. There was nothing arbitrary or capricious about its decision to bar a vertically integrated grid operator from adopting a rule that could favor its own generators and so cement its dominant market position. The Commission's holding is consonant with decades of agency policy reflected in orders upheld by the Supreme Court and our court. The Commission also reasonably applied a different rule to a vertically integrated grid operator than it did to independent grid operators because vertically integrated operators have distinct competitive incentives.

We therefore deny the petitions for review.

**I**

**A**

The Federal Power Act gives the Commission the authority to regulate "both the transmission and the wholesale marketing of electricity in interstate commerce" to protect the public interest. *Public Citizen, Inc. v. FERC*, 7 F.4th 1177,

1182–1183 (D.C. Cir. 2021). In that capacity, the Commission oversees prices for interstate electricity "and all rules and practices affecting such prices." *FERC v. Electric Power Supply Ass'n*, 577 U.S. 260, 266 (2016).

Section 205 of the Act mandates that electrical utilities' rates and rules within the Commission's jurisdiction be "just and reasonable," and it bars regulated utilities from "mak[ing] or grant[ing] any undue preference or advantage to any person or subject[ing] any person to any undue prejudice or disadvantage[.]" 16 U.S.C § 824d(a), (b). Such utilities must seek permission from the Commission to make any changes to their rates or rules. *Id*. § 824d(d). A utility seeking a rate or rule adjustment under Section 205 bears the burden of showing that its proposal is just and reasonable. *Emera Maine v. FERC*, 854 F.3d 9, 24 (D.C. Cir. 2017).

**B**

**1**

Throughout most of the 20th century, electricity in the United States was generated, transmitted, and distributed by vertically integrated monopolies. *See Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361, 1363 (D.C. Cir. 2004) (Roberts, J.). Prodded in part by parallel efforts in Congress, in the mid-1990s the Commission undertook efforts to boost competition in the market for wholesale electricity. *See Transmission Access Policy Study Group v. FERC*, 225 F.3d 667, 682 (D.C. Cir. 2000) (per curiam), *aff'd sub nom. New York v. FERC*, 535 U.S. 1 (2002). As part of that process, the Commission determined that vertically integrated grid operators were unduly discriminating against independent generators. As owners of both transmission wires and power plants, these grid operators had the incentive and ability to favor their own generators over those of rivals either by

"refus[ing] to deliver energy produced by competitors or [by] deliver[ing] competitors' power on terms and conditions less favorable than those they appl[lied] to their own transmissions." *New York*, 535 U.S. at 8–9.

To redress that problem, the Commission's Order No. 888 required grid operators to provide unaffiliated power plants with equal access to their grids. *See* Promoting Wholesale Competition Through Open Access Non-Discriminatory Transmission Services by Public Utilities, 61 Fed. Reg. 21,540 (May 10, 1996) ("Order No. 888"). By "remedy[ing] undue discrimination in access to the monopoly owned transmission wires[,]" *id.* at 21,541, the Commission sought to promote vigorous competition between generators.

To ensure that generators received equal access to transmission grids, the agency required operators to offer standard terms and conditions for transmission service, outlined in a *pro forma* tariff designed by the Commission. Order No. 888, 61 Fed. Reg. at 21,618; *Transmission Access Policy*, 225 F.3d at 682. The Commission permitted grid operators to alter these standard terms only if they could show that "such deviations are 'consistent with, or superior to' the terms in the *pro forma* tariff." *Sacramento Mun. Util. Dist. v. FERC*, 428 F.3d 294, 296 (D.C. Cir. 2005) (quoting Order No. 888, 61 Fed. Reg. at 21,619). To further prevent market abuses, the Commission encouraged utilities to hand over control of their grids to independent system operators—that is, neutral third parties that would have no reason to favor one set of generators over another. Order No. 888, 61 Fed. Reg. at 21,551.

Soon after issuing Order No. 888, the Commission identified two additional roadblocks to open markets. First, utilities were not employing independent system operators in

sufficient numbers, leaving "lingering opportunities for transmission owners to discriminate in their own favor[.]" *Midwest ISO*, 373 F.3d at 1364. Second, before a generator could take advantage of the newly non-discriminatory transmission rates, it had to connect to the grid. The Commission was concerned that operators could use the complex process of interconnecting to the grid to "favor[] affiliated generators over independents[.]" *National Ass'n of Regul. Util. Comm'rs v. FERC*, 475 F.3d 1277, 1279 (D.C. Cir. 2007).

To address the first issue and "remove remaining opportunities for discriminatory transmission practices[,]" the Commission issued Order No. 2000, which offered more inducements to grid owners to hand over control of their networks to independent regional transmission organizations. Regional Transmission Organizations, 65 Fed. Reg. 810, 811 (Jan. 6, 2000) ("Order No. 2000"); *see also Public Util. Dist. No. 1 v. FERC*, 272 F.3d 607, 611 (D.C. Cir. 2001) (per curiam). In this opinion, we will refer to independent regional transmission organizations and independent system operators collectively as "independent operators."

The Commission then turned to the problem of operators favoring their own generators when considering grid interconnection requests. *See ESI Energy, LLC v. FERC*, 892 F.3d 321, 324 (D.C. Cir. 2018). In 2003, the Commission issued an order directing operators to adopt a standard set of procedures for processing applications from generators to plug in to the grid. *See* Standardization of Generator Interconnection Agreements & Procedures, 68 Fed. Reg. 49,846, 49,847 ¶ 2 (Aug. 19, 2003) ("Order No. 2003"); *see also National Ass'n*, 475 F.3d at 1279 (upholding Order No. 2003); Standardization of Small Generator Interconnection Agreements & Procedures, Order No. 2006, 70 Fed. Reg.

34,190 (June 13, 2005). The Commission explained that it was issuing Order No. 2003 to:

> (1) [l]imit opportunities for Transmission Providers to favor their own generation, (2) facilitate market entry for generation competitors by reducing interconnection costs and time, and (3) encourage needed investment in generator and transmission infrastructure.

Order No. 2003, 68 Fed. Reg. at 49,848 ¶ 12.

Under the standard procedures the Commission outlined in its order, operators generally consider interconnection requests on a first-come, first-served basis. *See* Order No. 2003, 68 Fed. Reg. at 49,851 ¶ 35. Recognizing that vertically integrated operators are more likely to play favorites among interconnection applicants than are independent operators, the Commission provided that vertically integrated operators cannot deviate from the standard interconnection process unless they show that their proposed changes are "consistent with or superior to" the baseline rules. *Id*. at 49,850 ¶ 26.

In contrast, the Commission considers independent operators' proposed changes to the interconnection process under a more flexible approach called the "independent entity variation" standard, which allows independent operators more freedom "to customize [interconnection procedures] to meet their regional needs." Order No. 2003, 68 Fed. Reg. at 49,850 ¶ 26; *see also id*. at 49,860 ¶ 147. Under the independent entity variation standard, the Commission will approve variations from the *pro forma* interconnection rules if they are "just and reasonable and not unduly discriminatory[] and would accomplish the purposes of Order No. 2003." Interconnection Queuing Practices, 122 FERC ¶ 61252, ¶ 13 n.10 (2008).

**2**

Though the Commission believed that its standardized interconnection process would reduce operators' opportunities to act anticompetitively, the agency recognized that it has downsides. Some grids have long queues for interconnection requests, leaving generators in the dark about when they can start selling power and how much it will cost to join the network. *See* Reform of Generator Interconnection Procedures & Agreements, Order No. 845, 83 Fed. Reg. 21,342, 21,345 ¶¶ 23–25 (May 9, 2018); Interconnection Queuing Practices, 122 FERC ¶ 61252, at ¶¶ 4, 15.

The Commission has responded in several ways. Most relevantly here, in 2008 the agency encouraged independent operators to propose streamlined interconnection procedures. Interconnection Queuing Practices, 122 FERC ¶ 61252, at ¶ 18; *see also* Order No. 845, 83 Fed. Reg. 21,342. Operators answered the call, and several received Commission approval to speed their review of certain generator projects. *See, e.g.*, *Midwest Indep. Transmission Sys. Operator, Inc.*, 124 FERC ¶ 61183, ¶¶ 41–42, 44 (2008). The Commission has also signed off on similar modifications for vertically integrated operators like PS Colorado as long as the changes have met the requirement that they be "consistent with or superior to" the Commission's baseline *pro forma* rules. *See Public Serv. Co. of Colorado*, 169 FERC ¶ 61182, ¶ 30 (2019).

Independent operators also have asked the Commission to allow a fast track for interconnection requests from replacement generators, which are new facilities built on the site of retired, previously interconnected plants. In 2019, the Midcontinent Independent System Operator ("MISO"), an independent operator running much of the grid in the corridor between Manitoba, Canada to the north and Louisiana in the

south, proposed this approach. *See Midcontinent Indep. Sys. Operator, Inc.*, 167 FERC ¶ 61146, ¶ 8 (2019). MISO argued that its proposal would lighten the interconnection backlog and speed the construction of cheaper and more environmentally friendly power plants. *Id.* at ¶¶ 5, 19.

The Commission granted MISO's request. *Midcontinent*, 167 FERC ¶ 61146, at ¶ 61. It found that fast tracking replacement generators would avoid unnecessary costs and duplicative grid-impact studies and would speed up entry of more efficient power plants. *Id*. at ¶¶ 61–62. The agency held that MISO's proposal was not unduly discriminatory because, "[i]n this circumstance," owners of existing generators looking to rebuild on the same site "are not similarly situated to developers of new resources for the purpose of obtaining interconnection service in MISO." *Id*. at ¶ 63. That was so, the Commission said, because unlike new plant developers, existing generator owners have already shown how their electrical generation will affect the grid and have already paid for any necessary upgrades. *Id*. at ¶¶ 64–65.

## C

### 1

PS Colorado is a utility that operates more than 4,700 miles of transmission lines in Colorado and transmits electricity for about 75% of the state's population. *See* TRI-STATE GENERATION & TRANSMISSION ASS'N, XCEL ENERGY, & BLACK HILLS ENERGY, 10-YEAR TRANSMISSION PLAN FOR THE STATE OF COLORADO 50–51 (2020). Besides running the grid, the company also owns the generators that produce about 60% of the electricity on its network. *See Public Serv. Co. of Colorado*, 171 FERC ¶ 61115, ¶ 36 (2020) ("*May Order*") (J.A. 61).

In March 2020, PS Colorado filed a request with the Commission to, as relevant here, create a streamlined process for replacement generators that was modelled on MISO's. Under PS Colorado's proposal, a replacement generator would be eligible to avoid the interconnection queue if, among other things, it is built on the same location as the previous generator and, generally speaking, will burden the grid no more than its predecessor plant. *See May Order* ¶¶ 11–18 (J.A. 53–55); J.A. 8–9, 22.

PS Colorado argued that its plan is "consistent with or superior to" the *pro forma* interconnection rules. J.A. 11. It asserted that the benefits the Commission had recognized for MISO's replacement generator program applied with full force to its plan: The new fast track would increase transparency in the replacement process, speed up the general interconnection queue, and avoid wastefully delaying replacement generators. PS Colorado asserted that the proposal would reduce opportunities for discrimination by stating clearly how it would consider replacement requests. The utility also insisted that, as the Commission had recently concluded, new and existing generators are not similarly situated, and so it was not unduly discriminatory for PS Colorado to treat them differently.

**2**

In May 2020, the Commission rejected PS Colorado's proposal. *May Order* ¶ 1 (J.A. 49). The Commission concluded that the utility's proposal was not "consistent with or superior to" the baseline rules in the *pro forma* tariff because it could allow a "more favorable interconnection process for [its] own generation and make it more difficult for its generation competitors to enter the market." *Id.* ¶¶ 34–35 (J.A. 61). That, according to the Commission, could give PS Colorado's own power plants an undue preference and frustrate

Order No. 2003's goals of "limit[ing] opportunities for transmission providers to favor their own generat[ors] and * * * facilitat[ing] market entry for generation competitors[.]" *Id.* ¶ 35 (J.A. 61).

The agency elaborated that PS Colorado owns power plants generating most of the energy on its grid, and the utility's plan would help its own generators retain their valuable transmission capacity and ward off potential competitors. *May Order* ¶¶ 36–37 (J.A. 61). The Commission noted that, under its standard interconnection rules, when an existing generator retires, the bandwidth on the grid it had occupied can be made available for a new generator. But under PS Colorado's plan, the retiree's transmission capacity would instead likely be locked up by incumbent generator owners, the largest of which is PS Colorado itself. *See id.*

The Commission explained that its grant of MISO's analogous proposal did not require granting PS Colorado's because MISO is an independent operator that "does not own generating facilities[,]" and so, unlike PS Colorado, MISO does not "have an incentive to obstruct independent generation from accessing the grid." *May Order* ¶ 38 (J.A. 62). For that same reason, approval of MISO's proposal was provided under the less onerous "independent entity variation" standard, while PS Colorado had to show that its new rule would advance the Commission's goals of preventing discrimination, promoting market entry, and encouraging grid investment at least as well as the *pro forma* tariff. *Id*. ¶¶ 35, 38 (J.A. 61–62).

**3**

PS Colorado requested rehearing. It first argued that the Federal Power Act precludes the Commission from granting an independent operator's tariff amendment while denying an identical proposal from a vertically integrated operator just

because of its integrated status. Second, PS Colorado noted that the Commission had not referred to the "independent entity variation" standard in its decision to approve MISO's replacement generator plan, and so it was arbitrary for the agency to rely on that standard in distinguishing the two cases. *See* J.A. 68. Third, PS Colorado asserted that its proposal would not allow it to unduly discriminate against independent generators. Fourth, PS Colorado argued that the agency arbitrarily departed from its finding in the MISO order that new and existing generators are not similarly situated. The company contended that new and replacement generators were just as differently situated on its grid as on MISO's, and so it was unfair for the Commission to treat its proposal differently. Finally, PS Colorado argued that the Commission erred by ignoring the evidence favoring its proposal, including benefits the agency had recognized in its *Midcontinent* decision.

Two months after PS Colorado's rehearing petition was denied by operation of law, the Commission addressed PS Colorado's arguments and reaffirmed its *May Order*. *See Public Serv. Co. of Colorado*, 172 FERC ¶ 61297, ¶ 2 (2020) ("*Rehearing Order*") (J.A. 98).

In its rehearing decision, the Commission rejected PS Colorado's argument that the independent entity variation standard was unduly discriminatory. *Rehearing Order* ¶ 6 (J.A. 101). The agency said that the greater flexibility afforded independent operators is rooted in a "recognition of their operating characteristics"—that is, their lack of self-interest in favoring some generators over others. *Id.* That difference also explained why all the grid operators the Commission had previously approved to run a streamlined generator replacement process had been independent operators. *Id.* ¶ 7 (J.A. 101–102).

The Commission then turned to PS Colorado's argument that its proposal was just and reasonable. The agency stood by its holding in *Midcontinent* that new and existing generators are differently situated. *Rehearing Order* ¶ 13 (J.A. 105). The Commission explained that it had rejected PS Colorado's plan because, though it "may feature safeguards against patent undue discrimination," the proposal would structurally "enable existing generation (of which the majority is owned by [PS Colorado]) to be replaced via an expedited interconnection process[,]" while requiring new generation "to undergo the full interconnection process[.]" *Id.* The plan would thus "inherently favor [PS Colorado's] existing generating resources." *Id.* So the Commission's decision "ensure[d] that [PS Colorado], as the entity proposing reforms that stand to disproportionately benefit replacement of its own generation, is not afforded undue preference over" other generator owners and developers. *Id.* (J.A. 106).

The Commission closed by explaining that "the potential for undue discrimination in favor of [PS Colorado's] generation is considerable, and [any] benefits are not sufficient to render [the] proposal 'consistent with or superior to' the *pro forma*" interconnection process. *Rehearing Order* ¶ 14 (J.A. 106).

PS Colorado timely petitioned this court for review of both the *May Order* and the *Rehearing Order*.

**D**

Shortly after rejecting PS Colorado's proposal, the Commission accepted a similar plan from the vertically integrated utility Dominion Energy South Carolina, Inc. *Dominion Energy S.C., Inc.*, 173 FERC ¶ 61171, ¶ 24 (2020). Unlike PS Colorado, Dominion had proposed that the streamlined replacement generator program be administered by

a neutral third party rather than by the operator itself. *Id.* The Commission found that the third-party administrator would "protect[] against discriminatory implementation" of the new process, and so concluded that the program's benefits outweighed its costs. *Id*. at ¶ 26.

Then-Chairman (now Commissioner) Danly concurred. He wrote separately to say that he now believed the agency's rejection of PS Colorado's proposal had been a mistake. *Dominion Energy*, 173 FERC ¶ 61171, at ¶ 3 (Danly, Chairman, concurring). He argued that the Commission had rejected PS Colorado's proposal because it unduly discriminated against new generators; by that logic, it should also have rejected Dominion's proposal, especially because Dominion owned an even larger share of the electrical capacity on its grid. *Id*. at ¶ 4. A neutral administrator would not obviate that concern, he said, and he observed that the Commission "did not even hint in [its PS Colorado decisions] that [it] [was] concerned about the potential for discriminatory implementation of the generation replacement program." *Id*. at ¶ 5.

In 2021, while this case was pending here, PS Colorado filed a request with the Commission to adopt a streamlined replacement generator program administered by an independent entity. *Public Serv. Co. of Colorado*, 175 FERC ¶ 61100, ¶ 1 (2021). The agency approved that proposal for the same reasons it gave in *Dominion Energy*. *Id.* at ¶¶ 16–17.

## II

We have jurisdiction under 16 U.S.C § 825*l*(b). We review Commission orders under the arbitrary and capricious standard. *ESI Energy*, 892 F.3d at 329. We will "uphold the Commission's factual findings if they are supported by substantial evidence." *Id.* The scope of our review is

"narrow[,]" and we defer to the Commission's technical decisionmaking within its expertise. *Electric Power Supply*, 577 U.S. at 292 (citation omitted).

## III

PS Colorado mounts three challenges to the orders below. First, it argues that the Commission irrationally concluded that its plan favoring replacement generators over new generators is unduly discriminatory, even though the agency had separately determined that replacement generators are differently situated from new generation for purposes of expedited interconnection. Second, it contends that the Commission's finding of potential discrimination against new generators was not supported by substantial evidence. Finally, PS Colorado asserts that the Commission's orders contradict its decision approving a nearly identical plan in *Midcontinent*.

None of those arguments succeeds.

## A

PS Colorado argues that the Commission's decision is built on an untenable contradiction. On the one hand, the Commission affirmed its holding in *Midcontinent* that new and replacement generators are not similarly situated. On the other hand, the Commission held that the utility's proposal was unduly discriminatory because it favored replacement generators over new generators. That is irrational, in PS Colorado's view, because it is not unduly discriminatory to treat differently situated entities differently.

PS Colorado's criticism is not unfair. The Commission certainly could have explained itself more clearly. But reading both the *May Order* and the *Rehearing Order* together, the agency's rationale and its reasonableness can be perceived

readily enough. We will "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citations omitted).

**1**

The Commission has broad discretion in assessing tariff proposals under Section 205 of the Federal Power Act. The phrase "'just and reasonable' is obviously incapable of precise judicial definition[.]" *Delaware Div. of Pub. Advoc. v. FERC*, 3 F.4th 461, 465 (D.C. Cir. 2021) (quoting *Morgan Stanley Cap. Grp. Inc. v. Public Util. Dist. No. 1*, 554 U.S. 527, 532 (2008)). The Commission likewise has "wide discretion to determine what constitutes undue discrimination." *Missouri River Energy Servs. v. FERC*, 918 F.3d 954, 958 (D.C. Cir. 2019) (formatting modified and citation omitted).

The Commission has used its discretion and expertise to craft the "consistent with or superior to" test for deviations from its *pro forma* rules. *See* Order No. 2003, 68 Fed. Reg. at 49,919 ¶ 826. Under this standard, it considers whether an operator's proposed tariff is "consistent with the broad non-discrimination goals" of the Commission's orders. *Sacramento Mun.*, 428 F.3d at 297. The Commission has explained that the test is "difficult to meet," and an applicant's burden under the standard is "significant." Order No. 2006, 70 Fed. Reg. at 34,236 ¶ 547; *see also id.* at ¶ 546 (explaining that the agency adopted the same standard as in Order No. 2003).[1]

---

[1] In Order No. 2003 the Commission adopted the "consistent with or superior to" test as applied to decisions under Order No. 888, which is the Commission's directive that grid operators serve generators on equal terms. *See* Order No. 2003, 68 Fed. Reg. at 49,919 ¶ 826.

The Commission has repeatedly applied that test to reject changes to vertically integrated utilities' interconnection procedures that the Commission believes would structurally favor the operator's own generation and could disadvantage new generators. For example, the agency has rejected rules that would have required new generators to pay for too many studies, *see Nevada Power Co.*, 167 FERC ¶ 61086, ¶¶ 20, 28 (2019), or that would have failed to give new generators "sufficient flexibility to accommodate delays that may affect their projects," *Public Serv. Co. of Colorado*, 163 FERC ¶ 61146, ¶ 31 & n.49, ¶¶ 32–33 (2018); *see also, e.g.*, *Public Serv. Co. of Colorado*, 166 FERC ¶ 61076, ¶ 31 (2019); *Southern California Edison Co.*, 110 FERC ¶ 61176, ¶ 52 (2005).

**2**

Here, the Commission reasonably applied the "consistent with or superior to" standard to conclude that PS Colorado's proposal would undermine two of Order No. 2003's central anti-discrimination goals: limiting self-dealing and promoting competition from new power plants. *See May Order* ¶¶ 35–37 (J.A. 61); *Rehearing Order* ¶¶ 13–14 (J.A. 105–106).

The Commission explained that PS Colorado's proposal "may result in a more favorable interconnection process for [its] own generation and make it more difficult for [new] generation competitors to enter the market." *May Order* ¶ 35 (J.A. 61). By "allowing its [own] replacement generation to circumvent the full interconnection process," the utility could give itself "an undue preference"—the ability to skip the interconnection queue—while leaving its would-be competitors in the slow lane. *Id.* ¶ 36. A central goal of Order No. 2003 is to "facilitate market entry for generation competitors[.]" *Id.* ¶ 35. Yet under PS Colorado's proposal,

new power plants would lose the access they might otherwise have had to the "interconnection capacity" that arises when an existing generator retires, while PS Colorado's own generators stood to gain. *Id.* ¶ 37. PS Colorado's plan would therefore "inherently favor [its] existing generating resources[,]" cementing its dominant market position and potentially "afford[ing its own generators] undue preference over developers or owners of third-party generation." *Rehearing Order* ¶ 13 (J.A. 105–106). That, the Commission concluded, was not "consistent with or superior to" the agency's standard rules requiring equal treatment of all generators in the interconnection queue. *Id.* ¶ 14 (J.A. 106).

Decades of precedent support the Commission's decision to prevent undue discrimination and promote competition. After all, the Commission's "authority generally rests on the public interest in constraining exercises of market power[.]" *National Ass'n*, 475 F.3d at 1280. The Commission, in fact, has a "responsibility to consider, in appropriate circumstances, the anticompetitive effects of regulated aspects of interstate utility operations" in exercising its authority under the Federal Power Act. *Gulf States Utils. Co. v. FPC*, 411 U.S. 747, 758–759 (1973); *cf. Morgan Stanley*, 554 U.S. at 531 ("The Federal Power Act * * * gives the Commission the authority to regulate the sale of electricity in interstate commerce—a market historically characterized by natural monopoly and therefore subject to abuses of market power.") (footnote and citations omitted).

The Commission's rejection here of a tariff amendment that would make it harder for the competitors of a vertically integrated transmission operator to enter the market, while helping to lock in the operator's own market position, certainly helps to accomplish that mission.

**3**

PS Colorado points to the Commission's statement that new and replacement generators are "not similarly situated[,]" *Rehearing Order* ¶ 13 (J.A. 105), and to this court's caselaw holding that we will not find undue discrimination unless "similarly situated" entities are treated differently. *Transmission Agency of N. Cal. v. FERC*, 628 F.3d 538, 549 (D.C. Cir. 2010). In PS Colorado's view, the Commission contradicted itself here by finding that the proposal's preferential treatment of existing generators could unduly discriminate against new generators.

Things are not so simple as PS Colorado supposes.

First, the Commission grounded its conclusion that PS Colorado had not borne its burden under Section 205 not only on a prediction of actual undue discrimination, but also on a finding that the plan would be contrary to the prophylactic goals of Order No. 2003. *See May Order* ¶ 35 (J.A. 61) (rejecting PS Colorado's proposal because it is "[c]ontrary to [the] principles" of Order No. 2003 and may "make it more difficult for [PS Colorado's] generation competitors to enter the market").

One of the Commission's chief goals in promulgating standard interconnection rules was to "minimize opportunities for undue discrimination" by transmission operators, and it does that in part by protecting "relatively unencumbered entry into the market[.]" Order No. 2003, 68 Fed. Reg. at 49,848 ¶¶ 11–12. The Commission's acknowledgment that new and existing generators are differently situated did not strip it of the authority to continue "facilitat[ing] market entry for generation competitors[,]" especially those owned by rivals to integrated operators. *May Order* ¶ 35 (J.A. 61); *see also id.* ¶ 38 (J.A. 61–62). And the Commission can promote market entry by

ensuring that "all generat[ors] * * * compete on a level playing field" in "accessing released interconnection capacity[.]" *Id.* ¶ 37 (J.A. 61).

For similar reasons, PS Colorado is mistaken when it says that the Commission rejected its proposal solely because it would help the utility's own power plants. The Commission's conclusion was not based merely on the fact that PS Colorado's plants could benefit from the rule, but also the risk that the proposal would structurally disfavor new competition against a vertical operator. *See May Order* ¶ 35 (J.A. 61); *Rehearing Order* ¶ 13 (J.A. 105–106).

Second, while the Commission agreed that new and existing generators can be differently situated, it also recognized that, when an integrated operator owns most of the generation on its grid, a rule favoring existing generators necessarily favors the operator's own power plants. *See Rehearing Order* ¶ 13 (J.A. 105–106). That is, the efficiency that a rule favoring existing generators generally promotes can end up undermining competition when adopted by a vertically integrated operator. Said another way, while PS Colorado's plan looks like a non-discriminatory proposal on the surface, in practice its design "inherently favor[s]" PS Colorado's existing generators "over developers or owners of third-party generation." *Id.* So in rejecting PS Colorado's proposal, the Commission reasonably exercised its discretion to determine what constitutes "undue discrimination." *Missouri River Energy*, 918 F.3d at 958.

To hold otherwise would mean that the Commission's finding that new and replacement generators are differently situated as a general matter somehow silently overruled Order No. 2003's determination that integrated operators give themselves "an unfair advantage" when they delay plugging in

new independent power plants.  Order No. 2003, 68 Fed. Reg. at 49,848 ¶ 11.  That makes no sense, especially in a case where the Commission was explicitly enforcing Order No. 2003.

PS Colorado asserts that there is nothing unduly discriminatory about a plan that allows existing generators to benefit on the same terms as any other generator already on the grid.  It compares the situation to "an office-wide ice-cream social" in which "the boss who pays for the event[] takes a scoop."  PS Colorado Reply Br. 14.  That, PS Colorado says, can hardly be called "favor[ing]" the boss.  PS Colorado Reply Br. 14.

But the metaphor obscures more than it illuminates.  For one thing, it fails to account for all of those never invited to the social in the first place—those trying to enter the grid.  PS Colorado's vision also fails to mention that the "boss" in this story would not take just a single scoop:  PS Colorado would be in line for six scoops out of every ten, each one of which might otherwise go to a would-be employee seeking to get in the door.

In short, the Commission rejected PS Colorado's proposal because it found the plan could favor or at least entrench generators owned by a vertically integrated operator and limit opportunities for other power plants to compete, undermining the goals of Order No. 2003.  *See May Order* ¶¶ 34–38 (J.A. 60–62); *Rehearing Order* ¶ 13 (J.A. 105–106).  That is a "rational connection between the facts found and the choice made[,]" which suffices under arbitrary and capricious review. *City & County of San Francisco v. FERC*, 24 F.4th 652, 658

(D.C. Cir. 2022) (quoting *Electric Power Supply*, 577 U.S. at 292).[2]

**B**

The Commission's decision was supported by substantial evidence. Substantial evidence, though less than a preponderance, is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Louisiana Pub. Serv. Comm'n v. FERC*, 20 F.4th 1, 7 (D.C. Cir. 2021) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 217 (1938)). In making decisions, it is "perfectly legitimate for the Commission to base its findings * * * on basic economic theory," including relying on "generic factual predictions[,]" as long as the agency "explain[s] and applie[s] the relevant economic principles in a reasonable manner." *Sacramento Mun. Util. Dist. v. FERC*, 616 F.3d 520, 531 (D.C. Cir. 2010) (per curiam) (citation omitted).

---

[2] PS Colorado argues that later Commission orders approving replacement generator interconnection proposals seem less concerned about obstructing new power plants from entering the grid. *See Dominion Energy*, 173 FERC ¶ 61171, at ¶ 24 (accepting vertically integrated operator's replacement generator fast-track plan); *id.* at ¶¶ 3–5 (Danly, Chairman, concurring); *Public Serv. Co. of Colorado*, 175 FERC ¶ 61100, at ¶ 15. We need not address those decisions or determine if they concerned proposals that are, in fact, materially similar to PS Colorado's proposal here, because they postdate the Commission's decision at issue. "An agency's decision is not arbitrary and capricious merely because it is not followed in a later adjudication." *Brooklyn Union Gas Co. v. FERC*, 409 F.3d 404, 406 (D.C. Cir. 2005) (citation omitted). PS Colorado could perhaps pursue this argument in a future filing under Section 205 of the Federal Power Act. *See* 16 U.S.C. § 824d. But the Commission's subsequent orders cannot affect our decision today.

The Commission's finding that PS Colorado's proposal would contravene Order No. 2003 by favoring its own power plants and making it more difficult for rival generators to enter the market was well supported. PS Colorado's 60% market share is uncontested, *see May Order* ¶ 36 & n.55 (J.A. 61), and its incentive to favor its own generators is a canonical economic principle, *see id.* ¶ 38 (J.A. 61–62); *see also*, *e.g.*, *Transmission Access Policy*, 225 F.3d at 684. Plus, PS Colorado itself supported the Commission's technical finding that the company's fast-track program would make it harder for new competitors to enter the grid. *See* J.A. 12, 91. So it can hardly contest that finding now.

PS Colorado argues that the Commission lacked "actual evidence of undue discrimination or an economic theory reasonably suggesting a likelihood of undue discrimination." PS Colorado Opening Br. 39. That is doubly wrong.

First, the undisputed purpose and predicted effect of PS Colorado's proposal was to allow replacement generators to keep for themselves bandwidth on the grid that might otherwise have gone to new competitors. PS Colorado told the Commission as much, explaining that under its plan, replacement power plants meeting certain conditions—including PS Colorado's own plants—could "retain [their predecessor's] contractual interconnection service rights[.]" J.A. 12.

That stands in sharp contrast to the Commission's *pro forma* rule that when existing plants go out of service, "those facilities may * * * be replaced with new facilities at different locations on the transmission system." J.A. 12; *see also* J.A. 91 (PS Colorado rehearing request). In this way, the standard interconnection rules limit the ability of existing generators' owners to hold on indefinitely to transmission capacity. When

plants retire, the grid bandwidth they rely on can be made available to whichever parties are next eligible in the queue.

PS Colorado asserted that its plan would allow replacement generators to efficiently reuse existing interconnection facilities. Maybe. But that does not change the fact that, under PS Colorado's plan, new power plants may lose access to relatively inexpensive electrical capacity retained by incumbents. PS Colorado points out that, even under the *pro forma* rules, some new generators may be owned by the same party as their predecessors, leaving the competitive landscape unchanged. PS Colorado Reply Br. 17–18. But it was enough for the Commission to find that, under the *pro forma* tariff, some new plants owned by others might replace PS Colorado's existing generators, adding more competition to the grid. *See May Order* ¶¶ 35–37 (J.A. 61).

In short, the Commission made the kind of "reasonable prediction" about "the market it regulates" to which we ordinarily defer. *South Carolina Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 96 (D.C. Cir. 2014) (per curiam) (citation omitted).

Second, the Commission's determination that PS Colorado has "reason to favor [its] own generation over others" was a sensible application of basic economic theory long recognized by courts. *Rehearing Order* ¶ 6 (J.A. 101). As we have said, generator-owning "[u]tilities that * * * control transmission facilities naturally wish to maximize profit" and so "can be expected to act in their own interest to maintain their monopoly[.]" *Transmission Access Policy*, 225 F.3d at 684; *see also Morgan Stanley*, 554 U.S. at 536.

The utility argues that, under our decision in *Ameren Services Co. v. FERC*, the Commission must assume that its earlier orders prevent most, "if not all[,]" discrimination by integrated operators because "the 'bad old days'" of vertically

integrated transmission operators are behind us. PS Colorado Opening Br. 32–33 (quoting *Ameren*, 880 F.3d 571, 578 (D.C. Cir. 2018)). *Ameren* said no such thing. That case held only that where just one of many "petitioning transmission owners * * * still own[ed] a generator[,]" the Commission could not apply a rule premised on grid operators generally having an incentive to discriminate against new power plants. *Ameren*, 880 F.3d at 578. In so holding, we were quick to emphasize that when grid operators "still own[] integrated generation"— as PS Colorado does—that "present[s] a competitive motive" to discriminate against independent power plants. *Id.* So much so that the Commission "is not obliged to show actual evidence to support a determination of potential discrimination" and can instead "rest on economic theory and logic." *Id.* (emphasis omitted). Which is what the Commission did here.

PS Colorado contends that the Commission's finding that the replacement generator proposal would harm new entrants conflicts with the agency's conclusion that the plan would de-clutter the interconnection queue. There is no contradiction. The Commission simply weighed the pros and cons of PS Colorado's plan and found that it came up wanting: "[T]he potential for undue discrimination in favor of [PS Colorado's] generation is considerable," and not outweighed by "the potential benefits" of the proposal. *Rehearing Order* ¶ 14 (J.A. 106). Such a reasonable balancing of divergent considerations on a matter within the Commission's expertise merits deference. *See New England Power Generators Ass'n, Inc. v. FERC*, 881 F.3d 202, 210 (D.C. Cir. 2018) ("Due to practical challenges and myriad divergent interests, FERC must be given the latitude to balance the competing considerations and decide on the best resolution in its regulation of electricity markets.") (internal quotation marks and citation omitted).

Finally, we lack jurisdiction to consider PS Colorado's other arguments that the Commission's competition analysis was factually wanting or in conflict with *Midcontinent*. *See* PS Colorado Opening Br. 36; PS Colorado Reply Br. 18–19. The company did not urge any of those claims with specificity in its request for rehearing to the Commission, and it has not given a "reasonable ground for failure to do so." 16 U.S.C. § 825*l*(b).

**C**

The Commission's orders comported with agency precedent. The Commission has allowed several independent operators to adopt a streamlined generator replacement program, most notably MISO. *See Midcontinent*, 167 FERC ¶ 61146, at ¶¶ 19, 61. So if PS Colorado and those independent operators were similarly situated, the agency would have some explaining to do. But vertically integrated and independent grid operators are not similarly situated for competition purposes. *See* Sections III.A–B, *supra*. The Commission thus permissibly treated PS Colorado differently than MISO and other independent operators.

That distinction also explains why the agency rejected PS Colorado's argument that since grid owners own most of the power capacity on MISO's grid, MISO is not so different after all. That mixes apples and oranges. The Commission's competition concerns are centered on the entity operating the grid and administering the plan, not on who owns the grid. *See* Order No. 2000, 65 Fed. Reg. at 811, 852; *May Order* ¶ 38 & n.57 (J.A. 61–62). The Midcontinent Independent System Operator, as its name suggests, runs the MISO electricity grid but owns no power plants. PS Colorado runs its grid, would administer the proposed plan, and owns existing power plants generating about 60% of the electricity on the grid. So the vertically integrated market structure that concerned the

Commission in this case simply does not exist in MISO. *See Rehearing Order* ¶ 13 (J.A. 105–106).[3]

PS Colorado offers two more arguments that the Commission departed from its precedent in the challenged orders. Neither succeeds.

First, PS Colorado argues that the Commission's failure in its *Midcontinent* decision to mention the "independent entity variation" standard—its less challenging standard for independent operators seeking tariff changes—must mean that the Commission was not applying that test. Not at all. The Commission's recognition that independent operators do not raise the same anti-competitive concerns as vertically integrated operators long predates *Midcontinent*. *See generally, e.g.*, Order No. 2000, 65 Fed. Reg. at 811. The agency has therefore consistently approached tariff modification requests from independent operators differently than those from vertically integrated entities. *See* Order No. 2003, 68 Fed. Reg. at 49,850 ¶ 26, 49,860 ¶ 147; *May Order* ¶ 38 n.57 (J.A. 62); *Rehearing Order* ¶ 6 & n.21, ¶ 11 & n.38 (J.A. 101, 104). Nothing in *Midcontinent* turned its back on that precedent. *Cf. Southwest Airlines Co. v. FERC*, 926 F.3d 851, 858 (D.C. Cir. 2019) ("[T]he Commission's consistent practice, whether adopted expressly in a holding or established impliedly through repetition, sets the baseline from which future departures must be explained."). Anyhow, because PS Colorado and MISO are differently situated for purposes of

---

[3] This is not to say that independent operators are necessarily incapable of unduly discriminating, including by favoring power plants owned by grid owners within their network. But no such case was before the Commission or is before us.

competition analyses, the Commission bears no burden to explain why it treated them differently.[4]

Second, PS Colorado's argument that in *Midcontinent* the Commission approved streamlined replacement generator programs as a free-floating "practice[,]" and so categorically gave them the Commission's just-and-reasonable stamp of approval, is flatly wrong. PS Colorado Opening Br. 49. Nowhere in *Midcontinent* did the Commission suggest that it was adopting such a sweeping rule. After all, a rule may be just and reasonable in one context and unjust and unreasonable in another. *See, e.g.*, *Emera Maine*, 854 F.3d at 23 ("Whether a rate * * * is unlawful depends on the particular circumstances of the case."). The Commission adequately explained its conclusion that a fast-track program for replacement generators would be impermissible here, even if it is just and reasonable in other circumstances.

**IV**

For all those reasons, we deny PS Colorado's petitions for review.

*So ordered.*

---

[4] PS Colorado also contends that application of the "independent entity variation" standard in *Midcontinent* cannot distinguish that decision because that standard only gives independent operators flexibility to address regionally specific needs, not nationwide concerns like interconnection backlogs. PS Colorado raised that argument for the first time in its reply brief and so it is forfeited. *See Reporters Comm. for Freedom of the Press v. FBI*, 3 F.4th 350, 364 (D.C. Cir. 2021).